**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **SADDIE DEBISSETTE GOMEZ**, | **CIVIL ACTION** |
| Plaintiff, |  |
| *v.* | **NO. 22-2949-KSM** |
| **SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**, |  |
| Defendant. |  |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                                    **October 27, 2022**

Plaintiff Saddie Debisette Gomez was robbed and assaulted by a fellow passenger while riding a train on Philadelphia's Market-Frankford Line late one evening.  (Doc. No. 1-4 ¶ 68.) She brings two claims against Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"), which owns and operates the Market-Frankford Line, arising from the robbery and assault.  First, she brings a claim under the "state-created danger" doctrine, contending that SEPTA's policies of understaffing its police force and ignoring passenger misconduct caused her harm.  (*Id.* ¶¶ 85–102.)  She also claims that SEPTA is liable for the harm caused by the robbery and assault under a theory of municipal liability.  (*Id.* ¶¶ 103–110.)  Presently before the Court is SEPTA's motion to dismiss.  For the reasons below, SEPTA's motion is granted.

**I.     BACKGROUND**

     *A.     Factual Background*

Accepting the allegations in the Complaint as true, the relevant facts are as follows.

At approximately 10:00 p.m. on May 4, 2022, Ms. Gomez arrived at the Bridge-Pratt terminal in Northeast Philadelphia to board the Market-Frankford Line.  (Doc. No. 1-4 ¶¶ 63–

64.)  While walking to the train, Ms. Gomez "noticed numerous people loitering at the station and on the platform in dishevled (*sic*) condition[s] and seemingly under the influence of drugs or other intoxicants."  (*Id.* ¶ 64.)  Shortly after boarding the train, Ms. Gomez was robbed and assaulted by another passenger, Nora McDougal.  (*Id.* ¶ 68.)  Ms. Gomez alleges that Ms. McDougal "had been riding the same Market-Frankford line train . . . in both directions aimlessly without having to exit the train after the completion of the one-way direction covered by the fare paid to SEPTA."  (*Id.* ¶ 66.)  Ms. McDougal was apprehended several stops after the attack and has been charged for the robbery and assault.  (*Id.* ¶ 69.)

Ms. Gomez claims that, at the time of the attack, SEPTA's police force was "woefully understaffed" (*id.* ¶¶ 9, 56), SEPTA operators were unable to "handle" fare evasion (*id.* ¶ 10), and unsanitary conditions pervaded SEPTA vehicles and stations (*id.* ¶¶ 16–18).  Specifically, Ms. Gomez alleges that SEPTA's failure to police minor offenses, such as fare evasion, drug use, intoxication, urination, and smoking, has promoted a "culture of lawlessness and filth."  (*Id.* ¶¶ 14, 51–52.)  She also alleges that SEPTA's failure to enforce ridership restrictions resulted in passengers being permitted to ride the Market-Frankford Line beyond completion of a single-fare ride.  (*Id.* ¶ 44.)  Ms. Gomez identifies more than twenty examples of crimes that occurred at SEPTA stations and on SEPTA vehicles, including on the Market-Frankford Line, which she claims are attributable to the agency's "sub-standard safety conditions."  (*Id.* ¶¶ 20–40, 46–48.)

Ms. Gomez claims that SEPTA's understaffing, unsanitary conditions, and failure to adequately police minor crimes flow from deliberate policy choices by SEPTA leadership.  (*Id.* ¶¶ 12, 15, 50–53.)  These policy choices, she alleges, have created a "general condition of lawlessness," constituting a "state-created danger" and violating Gomez's constitutional rights. (*Id.* ¶¶ 85–110.)

### B.      Procedural History

Ms. Gomez filed her Complaint in the Philadelphia County Court of Common Pleas. (Doc. No. 1-4.)  On July 27, 2022, SEPTA removed the matter to this Court.  (Doc. No. 1.)  On July 29, SEPTA filed a motion to dismiss (Doc. No. 6), which the Court dismissed without prejudice for failure to comply with Judge Marston's policies and procedures (Doc. No. 10).

On August 11, SEPTA renewed its motion to dismiss, arguing that Ms. Gomez has failed to state a claim for "state-created danger" because "the due process clause is a limitation on the State's power to act, not a guarantee of certain minimal levels of safety and security in society." (*See* Doc. No. 11-1 at 6.)  It also contends that Ms. Gomez has failed to state a claim for municipal liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978), because she has not alleged any violation of a constitutional right.  (*Id.* at 19.) Ms. Gomez opposes SEPTA's motion to dismiss but "concedes that, on its face, the case law regarding a state-created danger claim supports Defendant's request for dismissal."  (Doc. No. 12-2 at 7.)  Ms. Gomez argues for an "expansion of the facts" that could support a claim under the "state-created danger."  (*Id.* at 3.)  She also contends that "the context through which SEPTA's actions must be viewed requires a shift in perspective."  (*Id.* at 11.)  Finally, Ms. Gomez argues the *Monell* claim should not be dismissed because SEPTA "trample[d] on her [constitutional rights to] life and liberty."  (*Id.* at 12.)

## II.    LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although we must accept as true the allegations in the complaint, we are not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted). In other words, a "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (cleaned up). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

## III.   DISCUSSION

Ms. Gomez brings two claims:  one under the state-created danger doctrine and another under *Monell*.  The Court considers whether Ms. Gomez has stated a claim under either theory in turn.

### A.     *State-Created Danger*

Ms. Gomez brings a claim under 42 U.S.C. § 1983; she claims that SEPTA's policies of understaffing its police force and tolerating minor crimes created a danger that caused her harm and deprived her of her right to due process.  (Doc. No. 1-4 ¶¶ 85–102.)

Section 1983 does not create substantive rights; it provides remedies for "deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  Accordingly, to state a claim under Section 1983, a plaintiff must allege "a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law." *Id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

The right to due process is understood as a "limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Nonetheless, under the doctrine of "state-created danger," Section 1983 may provide a cause of action where the state "affirmatively creates or enhances a risk of danger" that causes the plaintiff's harm. *See Kaucher v. County of Bucks*, 455 F.3d 418, 431 (3d Cir. 2006). To state a claim under the doctrine, a plaintiff must allege four elements:

(1)   [t]he harm ultimately caused was foreseeable and fairly direct;

(2)   a state actor acted with a degree of culpability that shocks the conscience;

(3)   a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4)   a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018) (quoting *Haberle v. Troxell*, 885 F.3d 170, 176–77 (3d Cir. 2018)).

Ms. Gomez "concedes that, on its face, the case law regarding a state-created danger claim supports [SEPTA's] request for dismissal," but she asks the Court to "shift [its] perspective" in assessing each element. (Doc. No. 12-2 at 7.) The Court declines Ms. Gomez's invitation to rework the contours of the state-created danger doctrine. Instead, the Court will apply the law as established by the Third Circuit in determining whether Ms. Gomez has alleged each element.

## 1.     The Harm Was Neither Foreseeable nor Fairly Direct

The first element of a state-created danger claim requires that the harm ultimately caused have been a "foreseeable and fairly direct" result of the state actor's actions. *Sauers*, 905 F.3d at 717. The "foreseeability" and "fairly direct" requirements are analyzed separately. *See, e.g.*, *Henry v. City of Erie*, 728 F.3d 275, 282 (3d Cir. 2013); *Phillips v. County of Allegheny*, 515 F.3d 224, 237 (3d Cir. 2008).

To plead foreseeability, a plaintiff must allege "an awareness of risk that is sufficiently concrete to put the [state] actors on notice of the harm." *Henry*, 728 F.3d at 282 (quoting *Phillips*, 515 F.3d at 238). SEPTA argues that Ms. Gomez has failed to allege foreseeability, as "the Complaint is completely devoid of any factual allegation SEPTA knew of some threat posed by McDougal, or knew of any peril which Plaintiff was placed in by McDougal." (Doc. No. 11-1 at 14.) Ms. Gomez contends that SEPTA should have foreseen the danger because SEPTA's policies "manifest[ed] themselves in a sharp increase in assaults in the months, and even years, preceding Ms. Gomez's May 4, 2022 assault." (Doc. No. 12-2 at 8.)

We agree with SEPTA—the harm Ms. Gomez faced was not foreseeable. Ms. Gomez has not alleged that SEPTA was aware of any risk that was "sufficiently concrete" to put it on notice of the harm, and there are no allegations that SEPTA was aware of any threat Ms. McDougal posed to Ms. Gomez or SEPTA riders generally. Although Ms. Gomez alleges that Ms. McDougal remained on the Market-Frankford Line even after the subway made it to the end of the line (Doc. No. 1-4 ¶ 66), there are no allegations that SEPTA knew Ms. McDougal stayed on the train longer than her fare allowed. And even if SEPTA had been aware of this, a passenger's violation of the single-fare policy would not have put SEPTA on notice of the risk that the passenger may rob and assault another passenger. *Cf. Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 908 (3d Cir. 1997) (finding that the defendant's awareness that a violent actor was

6

loitering around the school was insufficient to provide notice that she would return in a few days to commit murder).

Regarding the "fairly direct" requirement, "the plaintiff must plausibly allege that state officials' actions 'precipitated or w[ere] the catalyst for' the harm for which the plaintiff brings suit." *Henry*, 728 F.3d at 285 (quoting *Morse*, 132 F.3d at 910). "[I]t is insufficient to plead that state officials' actions took place somewhere along the causal chain that ultimately led to the plaintiff's harm." *Id.* Plaintiffs must allege "that defendants' actions were close in time and succession to the ultimate harm." *Id.* SEPTA contends that Ms. Gomez's harm was not "fairly direct" because the policies Ms. Gomez claims led to her harm were in place for over a year before the assault. (Doc. No. 11-1 at 14.) Ms. Gomez argues that there was a close temporal relationship between the state action and her harm because numerous criminal incidents occurred in SEPTA facilities in the weeks prior to the assault on Ms. Gomez. (Doc. No. 12-2 at 8.)

The harm Ms. Gomez suffered was not the "fairly direct" result of SEPTA's policies. Ms. Gomez claims that SEPTA's policies on staffing its police force and patrolling its stations and vehicles caused her harm, but the causal chain between those policies and Ms. Gomez's alleged harm is far too attenuated. The policies were in place for over a year before she was assaulted, and an intervening cause—Ms. McDougal—broke the causal chain between SEPTA's policies and Ms. Gomez's harm. The Court is not persuaded by the argument that Ms. Gomez's harm was a "fairly direct" result of SEPTA's policies because there were other attacks on SEPTA vehicles in the month before Ms. Gomez's attack, as Ms. Gomez does not allege that the other attacks—or SEPTA's response thereto—caused her harm. Because the policies were implemented over a year prior to Ms. Gomez's attack and because Ms. McDougal's criminal actions break the causal chain between SEPTA's policies and Ms. Gomez's harm, Ms. Gomez

has failed to plausibly allege that her harm was a "fairly direct" result of SEPTA's policies. *See Quinn v. Badolato*, No. 16-0591, 2016 WL 4107701, at *5 (E.D. Pa. July 29, 2016) (finding the harm to the plaintiff was not "fairly direct" where there were multiple intervening events between the defendant's actions and the plaintiff's injury the next day).

Ms. Gomez's harm was neither a foreseeable nor fairly direct consequence of SEPTA's actions, so she has failed to plausibly allege the first element required to state a claim under the state-created danger doctrine.

Because Ms. Gomez has failed to allege the first required element, her state-created danger doctrine fails; however, for the sake of completeness, the Court will consider whether she has alleged the remaining elements.

## 2.    SEPTA's Conduct Does Not "Shock the Conscience"

The second element requires that the defendant have acted "with a degree of culpability that shocks the conscience." *Sauers*, 905 F.3d at 717. When a state actor has time to make unhurried judgments, its conduct "shocks the conscious" if the state actor is "deliberately indifferent" to a "great risk of harm." *Sanford v. Stiles*, 456 F.3d 298, 309–10 (3d Cir. 2006). Even where the state actor is aware of specific dangers, courts presume that the administration of government programs "is based on a rational decision making process that takes account of competing social, political, and economic forces." *Collins v. City of Harker Heights*, 503 U.S. 115, 128–29 (1992). Courts are loath to second guess policy choices based on rational decision-making processes, particularly where the choice is about the allocation of limited resources. *Id.*

Ms. Gomez has alleged that SEPTA chose to "allow increased violence against its passengers" by understaffing the police, permitting passengers to ride trains indefinitely (without being removed when a train reaches the end station), and allowing "intravenous drug usage and public intoxication at all hours." (Doc. No. 1-4 ¶¶ 12, 50–53, 97, 109; *see also* Doc. No. 12 at

14.)  SEPTA argues that the policies that allegedly led to Ms. Gomez's harm do not "shock the conscience" but rather were reasoned choices based on a deliberative process about how to allocate limited resources.  (*Id.*)  Ms. Gomez argues that SEPTA's policies were not based on decisions about how to allocate limited resources but rather reflected an active choice "to allow increased violence against its passengers."  (Doc. No. 12-2 at 10).

SEPTA's alleged conduct does not "shock the conscience."  The allegations about understaffing the police force or failing to enforce the rules of ridership amount to no more than a criticism of SEPTA's decisions about how to allocate limited resources.  Even if SEPTA's decision to limit staffing increased the risk of passenger-on-passenger crime, these are "the type of budgetary decision[s] that state governments are presumptively entitled, if not forced, to make."  *See Crockett v. Se. Pa. Transp. Ass'n*, No. 12-4230, 2013 WL 2983117, at *5 (E.D. Pa. June 14, 2013), *aff'd*, 591 F. App'x 65 (3d Cir. 2015).  SEPTA is a public transportation agency operating on a limited budget; it obviously does not want its passengers to be harmed or feel unsafe, but SEPTA's decisions about how to employ an understaffed police force inevitably involve tradeoffs.  Protecting against more severe crimes may entail less enforcement of minor crimes, and focusing police presence in high crime areas may mean less enforcement in lower crime areas.  It is not for the court to second guess these choices or compel one method of enforcement at the cost of another.

In fact, Ms. Gomez acknowledges in the Complaint that SEPTA's policy decisions were driven by the need to allocate resources among a number of competing programs.  (Doc. No. 1 ¶ 14 ("SEPTA's enforcement decision to encourage a culture of lawlessness and filth on the [subway lines] while devoting employee resources to the Regional Rail system belies the profitability of the [subway lines], the fares from which support SEPTA's operations."); *id.* ¶ 15

(acknowledging that SEPTA's policy choices were driven, at least in part, by "economic conditions"); *id.* ¶ 42 ("SEPTA Police are understaffed, and their resources are misallocated as a direct result of SEPTA's policies.").)  The Complaint also includes allegations demonstrating that SEPTA made efforts to remedy the issues on SEPTA's vehicles and in SEPTA stations. (*See, e.g.*, *id.* ¶ 58 (explaining that "SEPTA attempted to combat the 'quality of life issues' on the [subway lines] by deploying dozens of private security officers to patrol").)

Because SEPTA's policy decisions were based on a rational decision-making process about how to allocate limited resources, and because SEPTA made efforts to ensure passenger safety on its subways and at its stations, SEPTA's policies cannot be said to "shock the conscience."  *See Crockett*, 2013 WL 2983117, at *5–6 (explaining that SEPTA's decision to forego daily equipment inspections was a "budgetary decision" necessary "to save limited governmental resources" that did not rise to the level of conscience shocking); *see also K.W. v. Se. Pa. Transp. Auth.*, No. 16-5578, 2018 WL 1583676, at *15 (E.D. Pa. March 30, 2018) (explaining that "decisions concerning the allocation of resources to particular aspects of the public transportation system are precisely the kind of policy choices the federal courts have been loath to second guess under the guise of substantive due process").

### 3.    Ms. Gomez Is a Member of the Public At Large, Not a Discrete Class

A plaintiff is foreseeable, as the third element requires, if she is "a member of a discrete class of persons subjected to the potential harm brought about by the state's actions."  *Morse*, 132 F.3d at 913.  Members of the "general population" are not foreseeable plaintiffs.  *Id.* SEPTA argues that its passengers are not a discrete class but rather members of the general population, and therefore Ms. Gomez was not a foreseeable plaintiff.  (Doc. No. 11-1 at 14.) Ms. Gomez does not address this argument.  (Doc. No. 12-2 at 7.)

Ms. Gomez is not a member of a discrete class.  Courts in the Eastern District of

Pennsylvania have held time and again that "SEPTA passengers do not constitute a 'discrete

class' of potential plaintiffs under the state-created danger doctrine."  *See Crockett*, 2013 WL

2983117, at *7; *see also Vulpe v. Se. Pa. Transp. Auth.*, No. 20-4709, 2021 WL 1387769, at *3

(E.D. Pa. Apr. 13, 2021) ("[C]ountless other[] SEPTA passengers . . . would have faced the same

scenario Vulpe faced on the day of the accident. . . . Vulpe was not part of a discrete class where

the 'the risk applied to thousands, or even hundreds, of people and the risk existed for an

indefinite or prolonged duration of time." (internal quotation omitted)); *Burnett*e *v. City of*

*Philadelphia*, No. 13-0288, 2013 WL 1389753, at *6 (E.D. Pa. Apr. 5, 2013) ("SEPTA

passengers do *not* constitute a 'discrete class' of potential plaintiffs under the state-created

danger doctrine."); *Martinez v. SEPTA*, No. 08-5021, 2009 WL 5101824, at *5 (E.D. Pa. Dec.

15, 2009) (holding that the plaintiff, who was assaulted and robbed by another passenger, did not

have a special relationship with SEPTA).  There are no allegations that SEPTA officials knew or

had reason to know of any risk posed to Ms. Gomez specifically, and Ms. Gomez even

acknowledges that she was a member of the general population of SEPTA riders, not a discrete

class. (*See, e.g.*, Doc. No. 1-4, ¶¶ 83, 91).

Because Ms. Gomez is a member of the general population of SEPTA riders and not a

foreseeable plaintiff, she fails to plausibly allege the third element.

### 4.    SEPTA Did Not Act Affirmatively to Create a Danger

The final element of a state-created danger claim requires that the state actor

affirmatively exercised authority to create a danger or increase a plaintiff's exposure to danger.

*See Bright v. Westmoreland County*, 443 F.3d 276, 282 (3d Cir. 2006); *Ye v. United States*, 484

F.3d 634, 638–43 (3d Cir. 2007).  A state actor's *failure* to act does not constitute an *affirmative*

act.  *See Bright*, 443 F.3d at 282; *see also Crockett*, 591 F. App'x at 67 (holding that SEPTA's

11

"forgoing daily inspections, passive inertia, resulting in nothing being done, falls short of an affirmative act in the traditional sense").  SEPTA argues that the Complaint does not allege an *affirmative* act taken by SEPTA  and instead, focuses only on SEPTA's *failure* to act.  (Doc. No. 11-1 at 17.)  Ms. Gomez insists that SEPTA "intentionally act[ed] to undermine [riders'] safety through its social welfare experiment policies."  (Doc. No. 12-2 at 11.)

Despite Ms. Gomez's arguments to the contrary, her Complaint does not allege any affirmative acts—it merely alleges that SEPTA failed to act.  Specifically, Ms. Gomez has alleged that SEPTA did the following, none of which can be considered an affirmative act: allowed unsanitary and unlawful conduct, understaffed its police force, failed to enforce its own code of safety and conduct, allowed a dangerous passenger onto its trains, chose not to adequately portion their police force, and chose not to allocate resources to remedy dangerous situations.  (Doc. No. 1-4 ¶¶ 12, 15, 93, 97–99).  Indeed, Ms. Gomez's own characterization of the Complaint acknowledges that her claim arises from SEPTA's *in*action: "Plaintiff's complaint seeks recompense because of injuries from a new state-created danger in which the state specifically chooses to *ignore* the civil rights of its citizens . . . ." (Doc. No. 12-2 at 9–10 (emphasis added).)  The use of the word "ignore" recognizes the passive nature of the alleged acts and undermines Ms. Gomez's attempts to frame them as affirmative.

In *Morrow v. Balaski*, 719 F.3d 160, 178–79 (3d Cir. 2013) (en banc), the Third Circuit held that a school's failure to prevent a dangerous person from riding a bus despite fellow passengers' no-contact order against him did not constitute an affirmative act.  The court refused to define any failure to act as "an affirmative exercise of authority" because doing so would broaden state actors' liability "for any injury that could be linked to either action or inaction."

*Id.* at 178.  Here, the fact that SEPTA's allegedly too-lax policies permitted a dangerous passenger on its trains is likewise not an affirmative act.

Ms. Gomez's additional allegations regarding SEPTA's policy decisions also deal with SEPTA's alleged *failure* to act—not its affirmative actions.  For instance, Ms. Gomez refers to SEPTA's "deliberate acts of permitting rampant lawlessness . . . and overall refusal to enforce its own code of safety and conduct."  (Doc. No. 1-4 ¶ 97.)  The use of active language does not disguise the fundamental inactive nature of the alleged conduct—SEPTA *permitted* lawlessness and did *not* enforce its own code of safety and conduct.  *See, e.g. Johnson v. Se. Pa. Transp. Auth.*, No. 16-3599, 2016 WL 6247570 (E.D. Pa. Oct. 26, 2016) (finding that the plaintiff did not satisfy this requirement where the complaint included allegations regarding SEPTA's failure to properly train and dispatch its police force but did not allege any affirmative act)  Because the Complaint attributes Ms. Gomez's harm to SEPTA's alleged failure to act and not to SEPTA's affirmative actions, Ms. Gomez has failed to plead the fourth requirement.

\*     \*     \*

To state a claim under the state-created danger doctrine, a plaintiff must allege four elements, but Ms. Gomez has not plausibly alleged a single element, so her claim fails.

### B.     *Monell*

Ms. Gomez also alleges that SEPTA maintained policies exhibiting deliberate indifference to citizens' rights to life, liberty, and bodily integrity afforded in the Due Process Clause.  (Doc. No. 1-4 ¶¶ 104–110.)

A state actor can be held liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," violates a constitutional right.  *Monell v. Dep't of Soc. Servs.*,

436 U.S. 658, 694 (1978).  The Due Process Clause was created as "a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  *See DeShaney*, 489 U.S. at 195.  It does not impose an "affirmative obligation on the State to ensure that [life, liberty, or property interests] do not come to harm through other means."  *Id.*  Moreover, the Due Process Clause "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."  *Collins*, 503 U.S. at 128. Accordingly, the Supreme Court has "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Id.*

The Constitution does not require SEPTA to guarantee minimal levels of safety and security to its passengers, and SEPTA did not create the danger that led to Ms. Gomez's injuries. Accordingly, SEPTA has not engaged in a constitutional violation, so Ms. Gomez's *Monell* claim fails.  *See  Macias v. Sch. Dist. of Allentown*, No. 15-3730, 2017 WL 5453498, at *8 (E.D. Pa. 2017) (dismissing the plaintiff's *Monell* claim because the defendants did not create the danger that resulted in the harm.)

\*       \*       \*

The Court acknowledges that Ms. Gomez endured a physically and emotionally traumatic situation when she was robbed and assaulted on the subway, but she has failed to state a claim against SEPTA under either the state-created danger doctrine or *Monell*.  Because Ms. Gomez's claims arise from SEPTA's failure to take action to protect the entire population of SEPTA riders, no amount of artful pleading could save either claim, so the dismissal will be with prejudice.

14

**IV.    CONCLUSION**

For the reasons above, SEPTA's motion to dismiss is granted.

An appropriate Order follows.